UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

**UNITED STATES OF AMERICA,**

                       **Plaintiff,**             Case No. 2:24-CR-17-1

    **v.**                                        Hon. Robert J. Jonker
                                            U.S. District Court Judge

**JOHNATHAN DEMITRIUS GREEN,**

                       **Defendant.**

_____

**DEFENDANT'S SENTENCING MEMORANDUM AND
MEMO IN SUPPORT OF MOTION FOR DOWNWARD VARIANCE**
_____

In anticipation of sentencing, the defendant Mr. Johnathan Demitrius Green, through his attorney Paul Mitchell, offers this memorandum for the Court's consideration. Sentencing currently stands set for November 4, 2025, at 3:00 p.m. The probation office filed an amended final presentence investigation report (PSIR) on October 9, 2025. *See* RE. 204: Amended Final PSIR, PageID # 1226-70. The government has one objection to that report that remains outstanding. Counsel will explore and respond to that government objection below. Mr. Green is asking the Court to consider a sentence below the low end of the final advisory sentencing range, since such a sentence would best serve the purposes of 18 U.S.C. § 3553(a). His codefendants have all received noncustodial sentences, and a similar sentence would best suit Mr. Green's circumstances, given the guideline commentary related to U.S.S.G. §§ 4C1.1 and 5C1.1 and the circumstances of this case.

### *Introduction and Procedural Background*

This case began a little over a year ago, with an indictment file in July 2024, charging Mr. Green and four others with conspiring to commit money laundering, in violation of 18 U.S.C.

1956(a)(1)(B)(i). *See* RE. 2: Redacted Indictment, PageID # 6-8. Essentially, the government accused the men of participating in a scheme to launder proceeds from others' online "sextortion" scheming that had involved blackmailing young men who had been defrauded into sending sexually explicit images to others (*not* to the conspirators charged in the indictment). *See id*. Federal authorities took Mr. Green into custody in Georgia on August 1, 2024. Ultimately, Mr. Green's codefendants pleaded guilty in accordance with plea agreements. Mr. Green, however, pleaded guilty without a plea agreement. This plea occurred on April 2, 2025, and the Court allowed Mr. Green to remain on bond. RE. 107: Minutes of Change of Plea, PageID # 279. While on bond, Mr. Green did have some issues with smoking marijuana and failing to report a change of residence. *See* RE. 204: Amended Final PSIR, PageID # 1232, ¶ 17. Efforts to secure a location-monitoring device for Mr. Green failed. *See id*. at 1233, ¶ 20. Mr. Green turned himself in to the U.S. District Court in Atlanta Georgia on July 16th, 2025. He was detained pending transfer to this district, and has been in custody since that time. Now, with the amended final PSIR filed and sentencing approaching, Mr. Green is ready to appear before this Court. He is prepared to express his remorse for his offense and for his multiple mistakes on bond.

### *Sentencing Factors and Discussion*

The Court well knows the discretion it enjoys in these matters under *United States v. Booker*, 543 U.S. 220 (2005), and the Court knows the balancing called for under 18 U.S.C. § 3553(a), so counsel will not belabor that discretion, or the enumeration of those sentencing factors, here. He will present Mr. Green's circumstances, as they relate to the § 3553(a) factors, and he will remind the Court that Mr. Green's codefendants have all received sentences of either two or three years of probation (two have home-detention provisions). In cases separate from

this one, two other individuals each received 210 months of imprisonment, and another individual is pending extradition from Nigeria.

### A.  *Mr. Green was adopted at a young age and grew up in a supportive family.*

Mr. Green got involved in the offense of conviction when a friend brought him into it. *See* RE. 204: Amended Final PSIR, PageID # 1235, ¶ 30. He did not know the nature of the extortion or fraud involved in others' wrongdoing, and he was shocked when he heard the details of the extortion and the tragic outcome for Victim 1. *See* RE. 204: Amended Final PSIR, PageID # 1255, ¶ 167. Mr. Green wasn't some sort of leader or master mind of any wrongdoing. He was literally at the bottom of the money-laundering hierarchy. *See id.* at 1236, ¶ 31; *see also id.* at 1253, ¶ 156 (recognizing lack of leadership roles for participants in scheme).

Personally, the offense and these proceedings have been devastating for Mr. Green. He was raised to know right from wrong, and revelation of his involvement in this offense has led to family problems for Mr. Green, whose loved ones are extremely disappointed in him. Mr. Green's involvement in this offense was purely motivated by the temptation of so-called "easy" money. He should have known there is no "easy" money. He should have sought out a second job to increase his income, instead of turning to fraudulent activity. That mistake has cost him dearly. He has experienced a dreadful year since his arrest. He is now convicted of a felony in federal court and all the ignominy that entails. To further add to his woes his father, who had been experiencing ill health for some time died in July of this year and this loss hit him hard *See* RE. 204: Amended Final PSIR, PageID # 1255, ¶ 171. A copy of the obituary accompanies this memorandum.

Mr. Green is thirty-four years old. He was born, and grew up, in Georgia, specifically suburban Atlanta. While his birth was tumultuous—he was born addicted to cocaine because of

3

his birth mother's addictions—he was adopted at age five and has enjoyed very close relationships with his adoptive parents, a fact that has made the loss of his adoptive father even harder. His was a positive upbringing, with sports, extracurricular activities, family support, travel, and material comforts. His mother has written to the Court in a letter attached to this memo. Indeed, Mr. Green enjoys abundant family support, as evidenced by that letter and by the other letters attached to this memo, which are from his aunts. The PSIR indicates both that Mr. Green holds a GED *and* that he graduated from high school. *Compare* RE. 204: Amended Final PSIR, PageID # 1228, *with id.* at PageID # 1258, ¶ 197. Indeed, he did graduate from high school, and after doing so, he attended a community college and then went to a university in Alabama. *See id.* at PageID # 1258, ¶ 197, & PageID # 1260-61, ¶¶ 213-15. Although he did not graduate from college, he enjoyed career options with his adoptive father's construction business. Likewise, he lived in his family's home with his brother, after his adoptive parents moved to a second home.

Family means a great deal to this man, who originally was born in tenuous conditions. He wants to get married and have a family of his own. He is committed to pursuing a career and providing for his future family, and he will help take care of his adoptive mother when she needs assistance. His criminal history is minimal (driving offenses), and he has qualified for the reduction in offense level under U.S.S.G. § 4C1.1(a).

### B. The guidelines here favor a time-served sentence with no further custody, and the PSIR recommends a sentence that includes $1,900 in restitution.

Under the advisory guidelines as calculated in the PSIR, Mr. Green has a final offense level of 11 and is in criminal-history category I. These calculations put him in Zone B of the sentencing table, with an advisory range of 8 to 14 months. As the PSIR details, a sentence with no further custody is not just possible but actually recommended. *See* RE. 204: Amended Final

PSIR, PageID # 1262-63, ¶¶ 231-32; *and see* U.S.S.G. § 5C1.1, comment. (n.10(A)). It bears repeating that Mr. Green's codefendants have all received noncustodial sentences.

Here, a sentence involving no further custody would best serve the circumstances of this case and the guideline commentary in §§ 4C1.1 and 5C1.1. Mr. Green was not a leader in this offense. He was unaware of the nature of the fraud or extortion committed by others in their own offenses. He did not involve himself with any victims directly. He did not orchestrate any actions toward any victims. His criminal history is limited to two driving offenses (basically, driving without a valid, active license), and he has received no criminal-history points.

### C.     *The government's objection related to restitution should be denied.*

The government has objected to the PSIR's calculation of $1,900 for restitution. *See* RE. 204: Amended Final PSIR, PageID # 1265, ¶ 245, & PageID # 1267-69. To sum things up, however, as the PSIR observes, the restitution orders in Mr. Green's codefendants' cases rest on plea agreements those codefendants negotiated, whereas Mr. Green has no such plea agreement and no understanding related to restitution. The $1,900 amount detailed in the PSIR is the appropriate amount. Mr. Green's offense of conviction caused no other harm.

As detailed in the PSIR, the applicable restitution statute is 18 U.S.C. § 3663A. *See* RE. 204: Amended Final PSIR, PageID # 1268. Under that section, a defendant is responsible for the harm they *directly* caused. Specifically, under the statute, the term victim "means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, *any person directly harmed by the defendant's criminal conduct* in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2) (emphasis added). And there lies the rub. As the PSIR accurately puts it: "Mr. Green did not know about the sextortion that led to MV1's death. He was not held responsible

5

for MV1's death under the sentencing guidelines, and it is the opinion of this officer [the PSIR writer] that he was not a direct or proximate cause of the death for restitution purposes either." RE. 204: Amended Final PSIR, PageID # 1268.

With § 3663A, the government must show (by a preponderance of the evidence) that a victim was *directly and proximately harmed* by the offense of conviction, so it must show that the harm to the victim was foreseeable to the defendant "in the course of committing the offense of conviction." *See United States v. Goodrich*, 12 F.4th 219, 223 (2d Cir. 2021). Proving causation falls to the government. *See id.* at 231. Also, a sentencing court may impose restitution *only* for losses arising from the *specific conduct* at the heart of *the offense of conviction. See id.* at 228. Here, the offense of conviction is money laundering—not extortion. The government's own indictment explains that the offense of conviction was knowingly conspiring to conduct financial transactions affecting interstate and foreign commerce, with such transactions involving the *proceeds* of specified unlawful activity. RE. 2: Redacted Indictment, PageID # 6. The proceeds of the earlier, separate offense—the fraud—committed by others—were already in hand for *this* offense of conviction. It was not transacting in that money that caused anyone harm here. Even assuming arguendo that the decedent's parents might qualify as victims in this scenario—and that is not a question the Court should even get to here—there is simply no causation between the *money laundering* and any harm.

Even considering the conspiracy broadly, there is no causation. Courts have said that a defendant's specific conduct within a conspiracy may include an agreement to a common plan for the conspiracy and thus may include the reasonably foreseeable acts of coconspirators for advancing *that* plan. *See Goodrich*, 12 F.4th at 228. For purposes of the scenario at hand, the conspiracy Mr. Green joined involved *money laundering*, not fraud or extortion. So the reasonably foreseeable acts would have to have flowed from the *money laundering*, not any

6

fraud or extortion. And no one was harmed by Mr. Green laundering $300. As the Second Circuit has put it, "Regarding cause in fact, the defendant's conduct must have been *a necessary factor* in bringing about the victim's harm." *Id.* at 229. And that's simply not the case with Mr. Green.

The government has suggested that Mr. Green knew about the sextortion in February 2022 and simply continued on with participating in the money-laundering scheme. *See, e.g.*, RE. 207: Gov. Memo on Restitution, PageID # 1334 ("And although Green's specific knowledge is not necessary for the result here, despite being briefed on the nature of the scheme underlying his conspiracy, Green continued to launder money in furtherance of the conspiracy, including the funds paid by DeMay."). The government's own interview report, however, attached to the government's memo on its position on restitution, provides that Coldmon told authorities:

> "We trying to stop this, I told him I stopped at this point." SA Fortunato asked if COLDMON told GREEN it involved kids being sextorted. COLDMON said he told him the whole thing. GREEN replied to COLDMON something to the effect of "'Bro, what the fuck.' He's like, he didn't know." COLDMON believes he told GREEN the same day the Central Washington University Police called him.

RE. 207-1: Ex. 1 to Gov. Memo on Restitution, PageID # 1345. Even taking these statements at face value (a thing that is hard to do, given the nature of the report as created by law-enforcement personnel and drafted based only on their account of the interview), this statement does not support the idea that Mr. Green knew all the details of the other offense and simply continued on. It shows he was surprised, even shocked, by such a revelation—"Bro, what the fuck" and "He's like, he didn't know." Further in that report, this line appears:

> GREEN continued after COLDMON told him about the Central Washington University police because GREEN needed the money. COLDMON did not know about anyone committing suicide. Neither GREEN nor LONDON ever mentioned someone committing suicide related to the fraud.

7

*Id*. It's hardly clear from this report that Mr. Green knew the full details of what was happening or the outcome of the actions of the wrongdoers involved in the extortion scheme. And even if he had known those details, any actions he might have taken were not necessary factors in bringing about the harm at issue. Regardless, though, these mentioned parties, including Mr. Green, did not know about the suicide. They certainly didn't foresee any sextortion, much less suicide. There is simply no evidence that Mr. Green "knew of, or could have reasonably foreseen, that his participation" in a *money-laundering* scheme would somehow result in a death. *Compare Goodrich*, 12 F.4th at 232.

The government's cases do nothing to change these conclusions. The case of *United States v. Quackenbush*, 9 F. App`x 264, 266, 268 (4th Cir. 2001), which the government produced in the course of raising its objections to the PSIR, involved plain-error review and an accessory after the fact, with the defendant fully aware of the bank robbery and fully supporting the robbers with their efforts to avoid detection for the robbery. Here, Mr. Green did not know anything about the sextortion offense, and even if he did know (and again, he makes no concessions on that point), he knew well after it had occurred. His conduct in no way furthered any extortion. He simply laundered $300, $300 that could have come from any illicit source and certainly did not represent some sort of significant sum to motivate continuing illegality. Indeed, the *Quackenbush* court explained that, if the harm to the person does not result from conduct underlying *an element of the offense of conviction*, or conduct that is part of a pattern of criminal activity that constitutes an element of the offense of conviction, the district court may not order a defendant to pay restitution to a harmed individual. *Id*. at 267-68. The *Quackenbush* court distinguished cases, like Mr. Green's, in which an offense was *not* the cause of the loss—that court declined to stretch restitution to cases in which the defendant's offense of conviction may have had *some relationship* to a loss. *See id*. at 269. Mr. Green's offense

8

caused no direct pecuniary harm to anyone here. *Cf. id.* His offense was laundering money after others had harmed the decedent in a separate offense. If anything, the carjacking in *Quackenbush* is far more instructive in Mr. Green's case. In *Quackenbush*, there had been a carjacking, and the government conceded on appeal that the restitution order was plainly erroneous with regard to the carjacking victim and her insurers because the losses to those victims were not linked to the defendant's offenses. *See id.* at 266 n.2.

In its memo on restitution, the government has cited other cases that likewise fail to advance its position. In *United States v. Hall*, 134 F.4th 782, 792 (5th Cir. 2025), the court clarified that "members of a conspiracy may be held jointly and severally liable for all foreseeable losses *within the conspiracy's scope*, even if a specific loss cannot be attributed to a single conspirator." Again, the scope of the conspiracy here stretched to money laundering. It did not involve the separate fraud or extortion. *That* conspiracy was wholly different and involved different participants. *See* RE. 204: Amended Final PSIR, PageID #1234, ¶ 24 ("The individuals responsible for that sextortion were identified as Samuel and Sampson Ogoshi and Ezekiel Robert in Docket Number 2:22CR00025. The Ogoshi brothers were convicted of Conspiracy to Sexually Exploit Minors, and were each sentenced to 210 months imprisonment on September 5, 2024. Mr. Robert is still pending extradition on charges of Sexual Exploitation of Children, Conspiracy to Distribute Child Pornography, and Conspiracy to Commit Stalking Through the Internet.").

In *Hall*, the defendant himself had participated in *both* the kickback scheme *and* the money-laundering scheme. His actions *caused* the government's losses—he was involved at all levels of the wrongdoing. *See Hall*, 134 F.4th at 791-93. That case featured a chain of financial crimes that intertwined. With Mr. Green, the extortion caused a completely separate—non-financial—harm unrelated to anything close to "illegal proceeds." Moreover, *Hall* is an out-of-

circuit case that cites language in *United States v. Shah*, 95 F.4th 328, 360 (5th Cir. 2024), related to a challenge to a *conviction*, rather than to the restitution challenge in that case. *See Hall*, 134 F.4th at 792 (citing page 360 of *Shah*). Neither the *Hall* decision nor the *Shah* decision truly focus on causation and restitution.

## *Conclusion*

Mr. Green asks the Court to consider a sentence below the final advisory guideline range, as the Court ultimately calculates that range. He asks the Court to consider his personal circumstances, the limited nature of his participation in the scheme constituting the offense of conviction, the noncustodial sentences his codefendants have received, and the rehabilitative potential of the support he enjoys in the community. He asks the Court to follow the PSIR's recommendation on restitution. And ultimately, of course, he asks the Court to consider the discussion above, his circumstances, and the § 3553(a) sentencing factors, and to impose a sentence sufficient, but not greater than necessary, to serve the purposes of 18 U.S.C. § 3553(a).

Dated: October 28, 2025                    Respectfully Submitted,

/s/ Paul L. Mitchell
PAUL L. MITCHELL (P-32296)
161 Ottawa N.W., Suite 405
Grand Rapids, MI 49503
(616) 742-5880